**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GABRIEL STELLATO, HANNAH BUCKLEY, REBEKAH COHEN, IMANI SCHULTERS, MIAH LATVALA, and MIKAYLA FALLON, individually and on behalf of all others similarly situated, | No. 2:20-cv-01999-GRB-ARL<br><br>Judge Gary R. Brown<br><br>Magistrate Arlene Rosario Lindsay |
| Plaintiffs, | |
| v. | |
| HOFSTRA UNIVERSITY, | |
| Defendant. | |

## DECLARATION OF JOSEPH I. MARCHESE IN OPPOSITION TO DEFENDANT'S MOTIONS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(6) AND 12(c)

I, Joseph I. Marchese, hereby declare as follows:

1.        I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs in this action.  I am an attorney at law licensed to practice in the State of New York, and I am a member of the bar of this Court.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto.

2.        I make this declaration in opposition to Defendant's motion for judgment on the pleadings.

3.        Attached hereto as **Exhibit A** is a true and correct copy of the April 15, 2021 Hearing Transcript of Defendant's first motion for judgment on the pleadings, which was denied as to Plaintiffs' breach of contract claims regarding tuition and fees.

I declare under penalty of perjury that the above and foregoing is true and accurate.

Executed this 9th day of September 2021 at New York, New York.

_/s Joseph I. Marchese_
Joseph I. Marchese

# EXHIBIT A

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK




----------------------------X
                            :
GABRIEL STELLATO, et al.,   :
                            :    20-CV-1999 (GRB)(ARL)
              Plaintiff,    :
                            :    April 15, 2021
                            :
         V.                 :    Central Islip, NY
                            :
HOFSTRA UNIVERSITY, GUERRA, :
                            :
              Defendant.    :
----------------------------X


   TRANSCRIPT OF CIVIL CAUSE FOR PRE-MOTION CONFERENCE
         BEFORE THE HONORABLE GARY R. BROWN
            UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        DANIEL KUROWSKI, ESQ.
                          ELLEN NOTEWARE, ESQ.
                          ANDREW OBERGFELL, ESQ.
                          BENJAMIN ZAKARIN, ESQ.


For the Defendant:        SUZANNE MESSER, ESQ.


Audio Operator:


Court Transcriber:        ARIA SERVICES, INC.
                          c/o Elizabeth Barron
                          102 Sparrow Ridge Road
                          Carmel, NY 10512
                          (845) 260-1377




Proceedings recorded by electronic sound recording,
transcript produced by transcription service
```

1          THE CLERK:  Calling case 20-CV-1999,

2    Stellato v. Hofstra University.

3          Counsel, please state your appearance for

4    the record.

5          MR. KUROWSKI:  This is Daniel Kurowski for

6    the Stellato plaintiffs.

7          MR. OBERGFELL:  Andrew Obergfell from Bursor

8    & Fisher, also for the Stellato plaintiffs.

9          MS. NOTEWARE:  Ellen Noteware from Berger

10   Montague, also on behalf of the Stellato plaintiffs.

11         MS. MESSER:  Suzanne Messer, Bond, Schoeneck

12   & King, on behalf of the defendant.

13         THE COURT:  Is that everybody?  Okay.

14         So plaintiffs have lots of counsel.  Who

15   will be taking the lead for the plaintiffs please?

16         MR. KUROWSKI:  This is Daniel Kurowski.  I

17   will be taking the lead for the Stellato plaintiffs.

18         THE COURT:  Okay, excellent, thank you.

19         MR. ZAKARIN:  My apologies, your Honor.  I

20   think I may have -- this is Benjamin Zakarin on behalf

21   of the Migliore plaintiffs, of the Sultzer Law Group.

22   I may have mis-heard the clerk requesting appearances,

23   in which case I would say that I'm here on behalf of

24   plaintiff Migliore in the other matter.

25         THE COURT:  Okay, excellent.  Anybody else?

1  Last call before the gavel comes down.  All right,

2  good.

3         I'm Judge Brown.  We're here for a pre-

4  motion conference.  We're doing this first of all via

5  audio conference because we find ourselves still in the

6  throes of a pandemic, which is preventing us from doing

7  this in the ordinary fashion, which would be in court

8  and better, but this will be good enough for today.

9         Second thing:  We're here for a pre-motion

10 conference and everyone should understand that anyone

11 can make any motion they want but I also reserve the

12 right -- there's some noise in the background.  Is that

13 something we can handle?  Okay.  If you're not

14 speaking, maybe you can mute yourselves.  Thank you.

15        I reserve the right to construe the plea

16 motion letters along with the arguments of counsel as

17 the motion itself and decide the motion in whole or in

18 part.  This is a procedure I've found very helpful

19 during these difficult times, in order to stay

20 consistent with Rule 1, which requires a certain level

21 of efficiency.

22        So let me start with the defendant because I

23 think it's your dime as they say.  This will be your

24 motion so why don't you tell me what you'd like to tell

25 me about it please.

1          MS. MESSER:  Thank you, Judge Brown.  My
2    name is Suzanne Messer.  I'm with the law firm of Bond,
3    Schoeneck & King, and I represent Hofstra in both of
4    these actions.
5          Just generally, and we have addressed this
6    in our pre-motion conference request letters, but the
7    crux of both of these cases is that the plaintiffs are
8    seeking refunds of tuition and fees that they paid to
9    Hofstra during the spring 2020 semester as a result of
10   Hofstra's transition to remote education because of the
11   pandemic and the mandatory shutdown orders issued by
12   Governor Cuomo.  Both cases assert breach of contract
13   causes of action, unjust enrichment, and conversion
14   claims.  The plaintiff in the Migliore matter is a law
15   student.  The plaintiffs in the Stellato matter --
16   there's a number of them -- they are undergraduate
17   students and I believe one law student as well.  So
18   that's sort of a general overview of the cases.
19          Hofstra is not distinct in these cases.
20   These cases have been brought against institutions
21   across the country and there are cases pending against
22   New York institutions in every district court in New
23   York right now.
24          THE COURT:  Right.  So what's the basis for
25   your claiming that these are subject to dismissal?

1          MS. MESSER:  Sure.  With respect to the

2  breach of contract claim, New York law is very settled

3  in this area of higher education, and the relationship

4  between an institution and its students is contractual,

5  so we agree that there is a contractual relationship.

6  However, for a promise from an institution to a student

7  to be enforceable under New York law, it has to be a

8  specific promise for a specific service.

9          The basis for the breach of contract

10  dismissal is that there is no such allegation here of a

11  specific promise for in-person education, which is what

12  the plaintiff would like the terms of this contract to

13  be.  The contract is instruction in exchange for

14  tuition and credit for that instruction.  That is what

15  was provided in the spring of 2020, even after the

16  transition to remote instruction.

17          The governing documents for the institution

18  are the handbooks, catalogues, bulletins, and

19  circulars, and the plaintiffs simply do not cite to any

20  statement in those documents that create a promise for

21  in-person education.  So for that reason, the contract

22  that they're alleging exists just simply doesn't exist.

23          THE COURT:  Right but, counsel, let me stop

24  you for a second.  I'm having a hard time wrapping my

25  head around the particular attack you're proposing to

1  mount on this complaint.  In other words, if you said

2  to me, Judge, this is a defense of impossibility,

3  illegality, something -- it could be act of God,

4  whatever it is, I don't know and I haven't done the

5  research.  I'd say that makes sense, right?  None of us

6  were expecting Covid, right?  But let's just sort of

7  cast our minds into a world where Covid didn't happen,

8  right, just as a hypothetical.

9       Things were going along ordinarily and you

10  had one student or one group of students who said, you

11  know what?  You're banished from campus.  You can't

12  come to campus but you can call in and listen to the

13  instructions on the phone.  I think this lawsuit -- I

14  think there would be something to it, right?  In other

15  words, the fundamental exchange here -- if you just

16  want to talk about whether or not there's a promise or

17  not, the fundamental exchange is, I'm paying money to

18  go to college and now I can't go to the college, I get

19  to see the college on t.v.  That's a little bit

20  different.

21       MS. MESSER:  Well, it certainly was

22  different, your Honor, but again, the terms of the

23  contract are what would control, and it has to be

24  specific promises.  The promise that the institution

25  makes to its students is to provide instruction and

1   credit in exchange for tuition.  That was done here so

2   we just respectfully disagree that this in-person

3   educational experience, which is what is alleged to be

4   the contract by the plaintiffs, isn't in fact the

5   contract, and it can be directly disputed by the

6   controlling documents.

7              In fact, that's what other courts in New

8   York have already done.  The Columbia decision that was

9   cited in our pre-motion letter, the NYU decision, the

10  Fordham decision -- judges throughout the Southern

11  District of New York against various institutions have

12  dismissed these claims because there is no such

13  specific promise contained in the controlling

14  documents.

15             THE COURT:  Okay.  Is that it?

16             MS. MESSER:  Well, then there is the --

17  there are various -- there are additional arguments in

18  support of and in opposition to that claim that

19  plaintiffs have raised in their letters, so I don't

20  know if you want to get into the details of addressing

21  those specific arguments at this point.

22             THE COURT:  Counsel, I'll listen to anything

23  you want to tell me.

24             MS. MESSER:  Sure.

25             THE COURT:  But I just want to know, is that

1   the sole ground for the motion is a lack of a specific

2   promise that you can attend the school when you pay to

3   attend the school?

4           MS. MESSER:  Sure.  So that is step one.

5   There's no specific promise so the contract doesn't

6   exist.  There was no breach of a contract because

7   remote instruction continued.  Plaintiffs argue in

8   their letters that the fact that the institution did

9   offer some "online" or distance learning programs

10  somehow translates into the fact that if you did not

11  enroll in one of those online or distance learning

12  programs, you then -- there's some implied contract

13  that everything else was traditional and in-person

14  education.

15          Again, the NYU and Columbia courts have

16  dispensed with that very argument and said no.  If

17  there is any contract for online education, perhaps a

18  student in that program can bring a breach of contract

19  action if the parameters of that program have not been

20  met.  But simply the existence of those types of

21  programs does not translate into an argument or a

22  specific promise for in-person education for everyone

23  else.

24          The other issue that I'd like to raise with

25  respect to the breach of contract claims are the

disclaimers that are included in both the handbook and the catalogues, both the undergraduate catalogue and the law school catalogue that essentially allow Hofstra -- reserve Hofstra's right to revise its educational programs at any time. So that is also at play here in this motion.

With respect to fees -- so there's the breach of contract with respect to tuition, which I've just addressed, and then there's a breach of contract with respect to certain fees. The arguments are essentially the same. These services were transitioned to be offered remotely. There's documentation of that, which can be considered on a Rule 12 motion to show that there was no contract that the plaintiff is alleging, and even if there was a contract, that it was not breached. That can be decided on a 12 motion, which is what we're asking to do.

Then there are a few other claims, which is unjust enrichment and conversion. There's no unjust enrichment claim here. We concede that there is a contractual relationship. There's certainly a dispute as to what the terms of that relationship are but there's no -- unjust enrichment is simply duplicative here, and that claim has been dismissed by all but one court in New York who have looked at these cases on

1    Rule 12 motions.

2              And with conversion --

3              THE COURT:  But the point there -- hold on,

4    let me stop you.

5              MS. MESSER:  Sure.

6              THE COURT:  Unjust enrichment and what was

7    the third claim you mentioned, sorry.

8              MS. MESSER:  Conversion.

9              THE COURT:  Conversion, yeah?

10              MS. MESSER:  Conversion claim.

11              THE COURT:  If the breach of contract claim

12    survives, then those two are definitely duplicative and

13    dismissed, yes?

14              MS. MESSER:  Yes.  Well, they should be

15    dismissed regardless but yes, unjust enrichment is

16    duplicative of the breach of contract.  Contract

17    conversion is also a tort claim; it's duplicative.

18    Also, there's no identifiable (ui).  Every single court

19    in New York that has decided these cases has dismissed

20    the conversion claim as well.  So yes, all of those

21    claims are subject to dismissal.  This would be a

22    motion that would address every single claim and we

23    could -- for that reason, we're also asking that

24    discovery be stayed during the pendency of the motion.

25              THE COURT:  Okay.  I mentioned those other

1 possible theoretical defenses earlier, you know, like I

2 sad, like an act of God, impossibility, illegality, and

3 so forth.

4             MS. MESSER:  Right.

5             THE COURT:  At what juncture would those

6 come up?  They're not suitable for a motion to dismiss?

7             MS. MESSER:  Well, they're not.  They're

8 summary judgment decisions.

9             THE COURT:  Okay.

10             MS. MESSER:  The fact --

11             THE COURT:  That's fine, got it.  All right,

12 great.

13             Who would like to go first for plaintiffs,

14 please?

15             MR. KUROWSKI:  Good afternoon, your Honor.

16 This is Daniel Kurowski for the Stellato plaintiffs.

17             THE COURT:  What would you like to tell me

18 about this?

19             MR. KUROWSKI:  I can respond in any way but

20 I always want to make sure that at the outset, if there

21 are any specific questions that your Honor has and

22 would like me to address before I go into my spiel, I'd

23 prefer to head in that direction.  Otherwise, I'd be

24 glad to go through a point-by-point rebuttal.

25             THE COURT:  Let me start with this.  You'll

1  agree with me that if your breach of contract claim

2  survives, the unjust enrichment (ui).

3        MR. KUROWSKI:  I would not, your Honor, in

4  part because of the nature of -- just because we have

5  alleged in-person education doesn't mean that

6  throughout the rest of the case, (ui) is going to

7  dispute that on a factual basis.  The cases, when we

8  look at unjust enrichment, are in recognition that you

9  can have an unjust enrichment claim in this context,

10  where a defendant disputes that the contract covers an

11  in-person education.  That's one of the reasons why

12  we've asserted that claim in the alternative such that

13  (ui).

14        THE COURT:  Hold on, hold on.  You're

15  hedging your bets in the sense that you want to tell me

16  this contract absolutely covers this situation and it's

17  a breach.  But just in case you don't, then we're going

18  to rely on unjust enrichment, yes?

19        MR. KUROWSKI:  In essence.  What we're

20  saying is that the subject matter of the claim --

21        THE COURT:  My point to you is -- right, but

22  if breach of contract survives, then unjust enrichment

23  I think gets dismissed.  I think that's the most black

24  letter of all black letter principles, right?  It's

25  done.  It's not fair.

1        MR. KUROWSKI: I agree that it's not fair

2  and where it comes into play, your Honor, is we can't

3  ultimately recover under both. So we can assert it and

4  then the jury decides if we've proved our claim for

5  unjust enrichment. If not -- if the jury sides in our

6  favor, the unjust enrichment claim disappears, but

7  that's the appropriate time for the claim to go away.

8        THE COURT: No, no, no, no, wait. The cases

9  say that you don't submit both a breach of contract and

10  unjust enrichment to the jury. We have to figure it

11  out before that phase, don't you think?

12        MR. KUROWSKI: I think if your Honor is to

13  keep the breach of contract claim and deny a motion to

14  dismiss on that, there are cases that dismissed unjust

15  enrichment in that situation.

16        THE COURT: Okay, thank you. All right,

17  with that said, you can roll with your pitch.

18        MR. KUROWSKI: Thank you. With respect to

19  the point that defense counsel raised, we disagree with

20  all of them, your Honor, first with respect to the idea

21  that there's no specificity in our case. We think this

22  case is very much like another New York case that

23  denied claims in this context, and the case is <u>Ford v.</u>

24  <u>Rensselaer Polytechnic Institute</u>, and <u>Ford</u> is very much

25  like 36 other cases in this realm from courts across

1    the country at the state and federal level that have

2    recognized student Covid 19 litigation claims as

3    plausible.  And very much like defendants in the other

4    cases, it's a very common argument for defendants to

5    say that plaintiffs haven't offered specific

6    indications or haven't cited to specific material that

7    requires or has a term for in-person education, and we

8    think that is just not the case here.

9            Looking to Hofstra's materials and the types

10   of documents that courts ordinarily consider to be

11   parts of the student/university relationship, we think

12   Hofstra made a number of bold claims about its in-

13   person programming and the benefits of an in-person

14   program and a variety of things.  In the complaint, for

15   example, your Honor, we point to the university's

16   undergraduate bulletins and other documents that talk

17   about what defendant refers to as exclusively in-person

18   classes, which it distinguishes from distance-learning

19   classes.  It charges different tuition rates for

20   entirely online versus entirely in-person classes as

21   well.

22           The university routinely recruits students

23   into its on-campus programs.  It considers the

24   residential-living program as an integral part of the

25   total student experience.  It identifies on-campus

1  resources, events, and services, and those are all

2  situations and services that, once the transition from

3  in person to entirely remote occurred, were services

4  and experiences that plaintiffs and the class members

5  were not able to access.

6          In our complaint, we also detailed through

7  another publication from defendant indicating, what

8  does your tuition cover?  It says, your investment at

9  Hofstra University includes a variety of things that

10 are utilized for in-person experiences and access and

11 facilities and labs and materials.  So we really do

12 dispute the concept or the notion that's being offered

13 by Hofstra here that we haven't alleged a specific

14 contractual term that in-person education is what the

15 parties bargained for here.

16          THE COURT:  Let me -- let me press you on

17 that a little bit.

18          MR. KUROWSKI:  Sure.

19          THE COURT:  Because I am a little confused.

20 I mean, look, you know, I'm working off of your summary

21 of cases and counsel's summary of cases, and I haven't

22 done the research myself.  But being somewhat familiar

23 with higher education, as we all are, right, there is

24 an enrollment agreement, right?  There's actually an

25 agreement that you sign with the institution that says,

1  here's the deal, here's the tuition, here's this,

2  here's that.  You're citing catalogues, bulletins,

3  campus tours, and I understand.  And maybe I'll reverse

4  my view of this case and say that maybe the unjust

5  enrichment survives or the breach of contract does.

6  But my question is, what's the contract?  Where is the

7  agreement between the students and the school?

8         MR. KUROWSKI:  Sure.  And the reason why we

9  cite to things like the bulletin and the course

10 catalogue and the university publications is because of

11 the way that New York law has treated the student

12 contractual relationship.  So it's not a situation

13 where there is -- in like a traditional sense, where

14 you have a document that is the contract.  So because

15 of that, New York law recognizes that it's an implied

16 contract and it's formed when the student -- when a

17 university accepts a student for enrollment and the

18 terms of the implied contract are contained in the

19 bulletins, circulars, and regulations made available to

20 the student.

21        That's the Second Circuit in the Pappalino

22 (ph) case, your Honor.  That's why we focused on the

23 bulletins, circulars, and documents that we did cite in

24 our complaint.  But you look at that as well, combined

25 with -- the totality of the objective manifestations of

1  the intent of the parties is expressed in their words

2  and deeds.  We think when you look at the totality of

3  the situation and the circumstances which everybody

4  bargained for, it was for in-person education.

5          THE COURT:  Well, you know, I'm going to --

6  let me just see something you described.  Actually, I'm

7  going to go back to defendant for a second.

8          Let me ask defendant's counsel, what are you

9  saying to me is the agreement?  Because I'm looking at

10  your letter and you're actually citing the handbook and

11  the bulletins.

12          MS. MESSER:  Yes, yes.

13          THE COURT:  So -- yeah.

14          MS. MESSER:  I apologize, I didn't mean to

15  interrupt you.

16          THE COURT:  What is the agreement?

17          MS. MESSER:  Sure.  So the agreement is

18  tuition in exchange for instruction and credit.

19          THE COURT:  No, no, no, I mean where's the

20  contract?  What am I supposed to read to decide whether

21  or not there's a promise of in-person instruction or

22  whether it's ambiguous on that point or it's absolutely

23  clear, as you're suggesting to me, that there is no

24  ambiguity and there was no promise?  Because I'm sure

25  if I go through the catalogue, there's a promise of in-

1    person -- it's going to say something like, our

2    beautiful campus in Hempstead -- and by the way, if you

3    haven't been there, it is a beautiful campus, right?

4              MS. MESSER:  It sure is.

5              THE COURT:  Right?

6              MS. MESSER:  Yes.

7              THE COURT:  There has to be something there

8    that one could construe as a promise, unless you're

9    telling me there is a specific enrollment agreement

10   that students sign online or on paper that says

11   otherwise.  So where is the agreement?

12             MS. MESSER:  Sure.  So the agreement, as New

13   York courts have defined the relationship, plaintiff's

14   counsel is correct, is the handbook, bulletin,

15   circulars, and catalogues.  So the academic catalogue

16   here of Hofstra, of both undergraduate and the law

17   school, is really the document -- the handbook also

18   sets forth the terms of the student relationship, but

19   the catalogue sets forth how much tuition you're paying

20   for specific credits.  You will not find in that

21   catalogue, the academic catalogue, that there is a

22   promise for in-person education.

23             What you're referring to, your Honor, is

24   some marketing materials and recruitment materials,

25   which do tout the benefits of being at this beautiful

1  campus in Hofstra.  Of course, that's what Hofstra

2  would like to have occur at all times.  But those are

3  marketing materials and they are not akin to documents

4  that can create a specific promise.  The courts in the

5  Fordham, Columbia, and NYU cases have all made that

6  distinction and state that just because there are

7  benefits of being on campus, that does not translate

8  into the specific promise that New York courts require

9  in this type of relationship.

10          THE COURT:  That's interesting.  That's very

11  interesting.  Wow, I thought this was going to be easy,

12  guys.  You've made this hard.  It's a job.  Forgive me,

13  I recognize that there's another plaintiffs' counsel

14  that I have not yet heard from.  Let me go to that

15  counsel and say, is there anything else you want to

16  add?

17          MR. ZAKARIN:  Thank you, your Honor.  This

18  is Ben Zakarin for plaintiff Matthew Migliore.  I just

19  wanted to address a few points, counsel for the other

20  plaintiffs having addressed many of the ones I wanted

21  to call to your attention.

22          The statement of law on student/university

23  relationship refers to the rights and obligations in

24  the university's bulletins, circulars, regulations,

25  handbooks, catalogues, et cetera.  And as counsel for

1  Hofstra just conceded, handbooks are indeed part of the

2  student/university contract because it sets out the

3  material terms of the relationship.

4         Counsel for Hofstra is saying that the terms

5  of the contract are tuition in exchange for

6  instruction.  They haven't referred to any specific

7  documents stating that and they haven't referred to any

8  source for that term of that agreement.  We would

9  argue, your Honor, that the terms are a little more in-

10  depth.  But either way, what that does is create a fact

11  issue as to, what are the terms of the contract, what

12  are the parties' obligations and rights?  That's a fact

13  question.  Clearly, we've alleged sufficiently that

14  there are specific policies in the handbook that

15  entitle plaintiffs to in-person education.

16         I would draw your Honor's attention to the

17  distance-education policy --

18         THE COURT:  Wait, I'm actually looking at

19  your complaint so that was good timing.  So tell me

20  where I should look in your complaint.

21         MR. ZAKARIN:  With respect to the distance-

22  education policy, paragraph 15, your Honor, sets forth

23  the policy, and paragraphs 16 through 20 explain the

24  meaning and effect of that contractual term.

25         THE COURT:  All right, hold on.  Am I

1  looking at the Migliore complaint?  No, wait, yes?

2  Which complaint are you citing?  Which complaint are

3  you citing?

4          MR. ZAKARIN:  Migliore.

5          THE COURT:  So I'm looking at Migliore.

6  Paragraph 13 says --

7          MR. KUROWSKI:  Your Honor, I apologize, 15.

8          THE COURT:  What?

9          MR. KUROWSKI:  15, your Honor, I apologize,

10  15.

11          THE COURT:  Okay, I was confused.  On March

12  8th, 2020, Hofstra Law announced that because of Covid

13  19 --

14          MR. KUROWSKI:  Your Honor, my apologies.

15  Are you referring to the amended class action -- first

16  amended complaint, paragraph 15?

17          THE COURT:  No, I was looking at the

18  original.  I was looking at the original, hold on.

19  It's a little more complicated in the world of Covid to

20  find stuff.  I don't have a big file in front of me.

21  It was easier.  Hold on.  So what docket entry is that?

22  Do you happen to know what docket entry it is?  It's

23  docket entry 15, yes?

24          MR. KUROWSKI:  Yes, your Honor.

25          THE COURT:  Which is the amended complaint,

1  thank you.  Okay, now I'm going to paragraph 15, yeah?

2            MR. KUROWSKI:  Yes, your Honor.

3            THE COURT:  Okay, that plaintiff and the

4  class contracted for in-person, on-campus instruction

5  is evident from Hofstra's law and distance-education

6  policy.  It defines distance education as a process

7  characterized by separation.  Okay, where do you allege

8  that this isn't what applies to your situation?

9            MR. KUROWSKI:  No, your Honor, we allege in

10  fact that this policy did apply.  And in fact,

11  plaintiff and students at Hofstra Law affirmatively

12  agreed to the distance-education policy, which

13  expressly would have -- expressly, number one,

14  prohibited them -- and Hofstra students agreed to this

15  contract term, that they prohibited them from enrolling

16  in any distance-education course, anything not in

17  person, live.

18            THE COURT:  How?

19            MR. KUROWSKI:  It prohibited them before

20  they completed 28 credit hours, which would be the

21  first year.

22            THE COURT:  Hold on, hold on, hold on.

23  That's kind of a huge leap, right?  In other words,

24  what you're saying to me is that the handbook has a

25  distance-education policy that says, you won't do it

1  this way unless you first complete 28 credit hours,

2  right?  That's what it says.  It doesn't say, we

3  promise you that it's going to be, you know, taught at

4  the wonderful facility.  It just says, you can't do

5  this unless you've first completed 28 hours, yeah?

6         MR. KUROWSKI:  Well, your Honor, yes, but I

7  would argue that it says -- that creates an obligation

8  on the part of Hofstra to provide students courses to

9  meet their minimum 12-credit-hour-per-semester class,

10  you know, course work.

11        THE COURT:  I am relying on your

12  characterization of the document.  You don't quote it,

13  right?  I don't think it's attached.  And if that's the

14  best you can do on a characterization, boy, that's

15  pretty far.  Do you have anything else in here?

16        MR. KUROWSKI:  Your Honor, I apologize for

17  my characterization because the way --

18        THE COURT:  No, no, counsel, I'm not saying

19  you.  I'm saying the complaint doesn't quote or cite

20  the handbook.  It just is generally characterizing what

21  it says.  If this characterization is the best you can

22  do, it sounds pretty far from a promise.

23        MR. KUROWSKI:  Well, your Honor, I would say

24  that I think it's actually discussed fairly at length

25  throughout -- all the way through to 20.  We did

1  include the hyperlink to it in the complaint.  The

2  point is this:  The policy's importance is that,

3  essentially, students were -- students contracted with

4  Hofstra for instruction of some kind -- the parties

5  agree on this much:  Students contracted with Hofstra

6  for instruction of some kind in exchange for tuition.

7  Plaintiff insists that it was in-person instruction --

8          THE COURT:  Counsel, imagine for a moment

9  that you don't have me on that point, right?  I just

10  don't see it.  Are there other allegations in this

11  complaint, in this amended complaint, that will point

12  me to contractual promises?

13          MR. KUROWSKI:  Are there other allegations

14  in here?  Well, your Honor, I would note that we do

15  address the difference between -- and this was not an

16  argument we intended to rely upon -- the difference

17  between tuition and -- between online and on-campus

18  programs.  I'd also note that Hofstra Law advertised

19  its campus as being essentially to the Hofstra Law

20  experience.

21          THE COURT:  Counsel, what you're saying to

22  me -- what you're saying to me about things like that,

23  I so hear you on this.  I would say that if you're

24  trying to defend the unjust enrichment piece, right,

25  that's like a home run.  That knocks it out of the

1  park.  But I'm looking for a breach of contract and I'm

2  not seeing it immediately.

3           MR. ZAKARIN:  Your Honor, you'll forgive me

4  for a little bit of nerves.  I would appreciate the

5  opportunity to better restate the argument with respect

6  to the policy we were previously discussing, and then I

7  would be happy to move on to the unjust enrichment

8  because I think --

9           THE COURT:  No, no, no.  Counsel, I'm

10 looking at the complaint.  Just help me find it, right?

11 In other words, show me where you allege and how you

12 allege -- because today is all about the allegations,

13 right?  I have to look and see if you have alleged a

14 plausible claim.  So show me where in the complaint --

15 and I'm going to give your co-counsel a chance to look

16 at the complaint and do the same thing.  Show me where

17 you've alleged a contractual promise that was breached.

18          MR. ZAKARIN:  The actual promise of on-

19 campus education is referenced in 19, not quoted from

20 anything but all students, all students past 28 credits

21 at Hofstra still could only enroll in up to 4 credits

22 per semester of distance education.  That means not

23 just, as your Honor said, Hofstra is saying, well, you

24 can't do this until you get the 28 credits.  What

25 Hofstra is saying is, for the between 12 and 17 credits

1  that you're required to take every semester, you may

2  not take any more than 4 credits by this alternative

3  means.  And Hofstra refers to that as programs beyond

4  traditional classroom -- beyond traditional classroom

5  programs in their handbook.

6          THE COURT:  Okay, all right, good.  What

7  else would you like to say?

8          MR. ZAKARIN:  Well, your Honor, with respect

9  to unjust enrichment, I would also note that I agree

10  with counsel for the Stellato plaintiffs that the

11  subject matter is critical for an unjust -- whether or

12  not the contract addresses the subject matter at issue

13  in the breach of contract claim is dispositive.  So

14  were the Court to determine that there were a viable

15  allegation for breach of contract for failing to

16  provide in-person education consistent with the Hofstra

17  students' rights and obligations under the parties'

18  agreement, then it still would not be appropriate to

19  dismiss it because we would -- the Court would still

20  need to determine the terms of the contract and whether

21  or not it did cover that subject matter.

22          THE COURT:  I get that, I get that.  I'm

23  more troubled by that but let me go to your colleague

24  for a moment.

25          Co-counsel, could you tell me in your

1   complaint, which I'm trying to pull up -- by the way,

2   are we working with your original complaint or an

3   amended complaint in Stellato?

4           MR. KUROWSKI:  Sure.  In Stellato, we have a

5   consolidated complaint, your Honor.  It's at docket

6   number 17.

7           THE COURT:  You know what I like about that?

8   It's something different.  I said amended or original

9   and you said no, consolidated.  Okay, that's great.

10          MR. KUROWSKI:  There were originally three

11  cases and they were combined into the one, your Honor.

12          THE COURT:  Beautiful.  I like combining

13  cases.  That's all good.  Thank you for that.  So now

14  I've just pulled up your complaint.

15          MR. KUROWSKI:  Sure.

16          THE COURT:  And I don't know if it mirrors

17  the complaint in Migliore or not, but can you point me

18  to paragraphs where you allege contractual terms,

19  contractual promises that were violated by what

20  occurred?

21          MR. KUROWSKI:  Sure, exactly.  I'd direct

22  your Honor to our complaint, starting for example at

23  paragraph 38.  In that paragraph, we kind of challenge

24  one of the contentions made by Hofstra here that oh,

25  these are marketing-type issues that Hofstra has -- or

1   marketing-type assertions or promises that Hofstra has

2   made, they're not contractual promises.  We challenged

3   that starting in 39 and describe the various promises

4   of on-campus instruction and access to the facilities

5   and resources that we allege were part of the

6   contractual agreement here.

7           So again, in paragraph 39, we're turning to

8   the student handbook.  This defines how we contend that

9   the publications set out what students receive in

10  exchange for paying tuition and fees.  We allege that

11  paying for tuition and fees is more than just the

12  opportunity to receive credits.  As recognized in

13  another New York case that I had mentioned before, the

14  Ford v. Rensselaer case, tuition may be payment for

15  instruction but the defendant can hardly deny that

16  there's more to the contractual relationship than such

17  a limited argument would suggest.

18          So 39 -- in 40, we describe for example

19  class schedules, setting out the in-person nature of

20  the classes, indicating the location where the classes

21  were held by buildings, room numbers, days offered,

22  start and stop times.  In addition, 41 further supports

23  our allegations of an in-person agreement, where

24  there's on-campus resources available to individuals as

25  well in-person events and services in 42.

1           Again, 43 talks about the library facilities

2    and -- facilities.  44, services that are all part of

3    things that we allege tuition pays for, and we allege

4    that Hofstra breached when it shifted the entire campus

5    to remote --

6           THE COURT:  I'm looking at 46, right, which

7    is --

8           MR. KUROWSKI:  46, yes.

9           THE COURT:  What is that an excerpt from?

10   This is the admissions section of the website.  Is the

11   website part of the agreement?  That's another

12   question, right?

13          MR. KUROWSKI:  That falls in -- it's not --

14   we would say it is reflective of the agreement because

15   this is a publication and a number of courts recognized

16   that a publication, the university's publications help

17   define and recognize what the students' expectations

18   are, what their reasonable expectations are under a

19   contract.

20          THE COURT:  Counsel, I'm actually just

21   pushing a little bit harder than I need to because you

22   covered it, right?  You have the bulletin stuff in here

23   and you have the handbook stuff in here, which is

24   clearly part of the agreement, and there are numerous

25   references to in-person instruction, right?

1          MR. KUROWSKI:  Exactly, your Honor, and I

2    think when you loop it back to what we've alleged and

3    what the stage of the case is here -- because as your

4    Honor had mentioned earlier, we're kind of taking what

5    we've alleged as true, and I think there are a few

6    guiding principles that press the scale, even if

7    there's a factual dispute as to whether the contract

8    covers in-person education or not.

9          I think, one, under Second Circuit, for a

10   breach of contract claim, we're now talking about a

11   particularity requirement of Rule 9(b), so we have to

12   kind of still look at our --

13         THE COURT:  I hear you.

14         MR. KUROWSKI:  -- analysis in that sense.

15   Again, ultimately, if there's -- I think our burden at

16   the pleading stage is slight, so --

17         THE COURT:  I understand that --

18         MR. KUROWSKI:  -- relatively simple

19   allegations will allege a breach of contract claim

20   here.

21         THE COURT:  Right.

22         MR. KUROWSKI:  And we submit that that's

23   what we've done here.

24         THE COURT:  Counsel, it's interesting

25   because early on, I brought up the notion of unjust

1  enrichment and the concern that it could be duplicative

2  and you rightly zealously defended your position.  But

3  as I think about it, if what we're talking about is the

4  worldwide pandemic, which has essentially shut down the

5  face of the planet for a long time that no one

6  anticipated and no one caused, what good are equitable

7  claims anyway, right?  In other words, there's no way

8  you could overcome -- I mean, there was nothing

9  untoward on the part of the university.  They didn't

10 cause the pandemic, right, and they had to follow the

11 laws and whatnot.  So your breach of contract claim is

12 actually stronger from that perspective.  Is that fair?

13             MR. KUROWSKI:  It is, your Honor, but I

14 think one of the important things to keep in mind with

15 respect to an unjust enrichment is, you don't have to

16 have any wrongdoing in order to --

17             THE COURT:  Yeah.

18             MR. KUROWSKI:  So there's no requirement

19 that --

20             THE COURT:  But it is equitable, right?  And

21 once you get to that equitable balancing, I can't

22 imagine that what actually happened doesn't come in and

23 sort of wipe out any inequity, you know?

24             MR. KUROWSKI:  Sure, right.  And I think,

25 again, looking at the case law here from having

considered this in other cases, whether these kind of

equitable principles -- ultimately, with unjust

enrichment, what's required is that the defendant can't

retain the benefit to plaintiffs' detriment, in

violation of fundamental principles of justice, equity,

and good conscience.  I think ultimately, those are

going to be questions of fact.  So even if it was

nobody's fault, that's going to be a question of fact

for a later date.

THE COURT:  Wow, okay.  I'm going to go back

to defendant's counsel.

Assume for the purposes of my conversation

only -- of my question only that I agree with you -- I

may agree with you that in the Migliore case, the

breach is not adequately pled.  If that's the case and

it's subject to dismissal, what would be your

suggestion as to the bases or basis for dismissing the

unjust enrichment and/or the conversion claim in that

case.  I'm talking about Migliore right now.

MS. MESSER:  Sure.  I do want to add just a

little more favor to the distance-learning policy

because New York State, as you know, has requirements

about the eligibility for taking the bar exam.  The

distance-learning policy that's cited in the handbook,

those are the New York State requirements for the

1  hybrid classroom and clerkship program that New York

2  State allows law students to undertake.  So in order to

3  be eligible to take the bar exam without going through

4  the traditional three years of law school, you can also

5  do sort of a hybrid plan, and that's set by the court

6  of appeals.  It's in the court of appeals rules.  So if

7  you were to refer to those rules, which of course we

8  cite in motion papers, that distance-learning policy is

9  not a Hofstra-created policy.  It's a court of law

10  examiner's policy.

11          THE COURT:  Right.

12          MS. MESSER:  So that's really what the

13  purpose of that policy is.  I agree with you that the

14  breach of contract is not adequately pled.

15          Moving on to unjust enrichment, Judge, you

16  hit the nail on the head.  I mean, higher ed is -- they

17  didn't benefit from having their students move off of

18  campus.  They incurred additional costs to transition

19  to remote education, technological costs, costs to

20  assist students in moving off of campus when they had

21  to, costs to assist students to continue on with their

22  education during the pandemic, whether that be in the

23  form of emergency aid or assistance for housing or

24  assistance for food or assistance for technology that

25  these students needed in order to move on in their

1  education and continue their education through the

2  spring term.  So the balance of the equities here --

3  you're not going to be able to find, you know, that

4  Hofstra benefitted, financially or otherwise.

5        In fact, you'll see in a lot of

6  institutions, you know, cuts in salary for the

7  administrators because what they're doing is trying to

8  shift resources to student aid.  You'll also see here

9  that everything that was available on campus, to the

10 extent it was possible to transition such things to

11 remote education/remote experiences was done so.  So

12 for example, career services, counseling services,

13 health services.  In fact, programming increased during

14 the spring 2020 term to attempt to enable these

15 students to have access to more services that they may

16 need and to keep them connected to the Hofstra

17 community.

18       So there is no unjust enrichment here.  The

19 balancing of the equities is not going to come out in

20 favor of the students versus the institution.  This is

21 not an ideal situation for anybody, and the institution

22 did what it could to enable that educational experience

23 to continue.

24       Conversion, again, that claim has not

25 survived any motion in New York, and the reason is

1 because once -- the rational behind dismissal is that

2 once the student pays their tuition, it doesn't remain

3 an identifiable fund.  The fund is disbursed throughout

4 the university's revenues, expenses, and is no longer

5 identifiable.  Therefore, for those reasons, it would

6 be dismissed regardless.

7        Your Honor reviewed the Stellato complaint

8 and if I could just make a couple of questions about --

9 a couple of comments about that.  There are references

10 to the bulletin with respect to this in-person -- this

11 in-person phrase.  But I just want to be very clear

12 that the references that were discussed, for example

13 paragraphs 40 and onward, are not for in-person

14 instruction.  They're just not.  They are for --

15        THE COURT:  Wait, wait, wait, they're for

16 in-person facilities, yeah?

17        MS. MESSER:  Well, so for example -- so one

18 of them is referencing career services.

19        THE COURT:  Right.

20        MS. MESSER:  Again, those career services

21 were transitioned to remote instruction.  And if you

22 read the bulletin, what they say is, we have one-on-one

23 advising services, we have in-person and online

24 workshops, we have field trips, things of that nature.

25 So what happened was, these things were transitioned to

1  a virtual setting.  And the court in Columbia and in

2  Fordham recognized that yeah, okay, these are benefits

3  that you're meant to have once you're going to college

4  but they are not specific promises for particular

5  services, and that's the same here.

6          The fact that -- the course schedule that is

7  quoted and cited, this is a theme we see in these

8  cases.  All of these institutions have these search

9  explorer websites that allow you to search for classes.

10  Of course, once the schedule is set, they get a

11  schedule that tells them where to go.  But the courts

12  have unanimously said in New York that have dismissed

13  these claims that this is information.  These are

14  search tools.  This does not create a specific promise

15  that things will always be done in this way.

16          THE COURT:  Right, but --

17          MS. MESSER:  So I just wanted --

18          THE COURT:  Counsel, in fairness, though, if

19  you do compare it to the cost schedule for distance

20  learning, which was lower I believe based on the

21  allegations here, right, and actually, common sense

22  would tell me the same thing --

23          MS. MESSER:  Um --

24          THE COURT:  No, go ahead.  Tell me if I'm

25  wrong.

1         MS. MESSER:  In fact, it's not the same

2    thing.  Again, I'd refer back to my initial discussion

3    of this online versus in person.  There are certain

4    programs that have traditionally been offered online.

5    They're offered at a lower rate because they're

6    fundamentally different than what happened, you know,

7    than the normal way of doing things.  They're also

8    fundamentally different than what happened in spring of

9    2020.

10        These online programs are asynchronous-type

11   courses.  They're not synchronous courses.  Again, just

12   because certain programs were promised to be online

13   does not translate into a promise that everything else

14   will be done in a particular modality.  That is quite

15   the leap, as your Honor has recognized.  So it just

16   doesn't translate, and what happened -- the programming

17   is just fundamentally different.  It's a comparison of

18   apples and oranges.

19        THE COURT:  Right.  But, counsel, you would

20   agree with me that but for the intervention of Covid,

21   right, this would be the biggest bait-and-switch in

22   history, right?  Come on, it just is.

23        MS. MESSER:  Sure.

24        THE COURT:  You would pay less for an online

25   course.  You know what I mean?  You're not going to

1 Hofstra, you're going to the University of Phoenix so

2 you do it online. It's different.

3 　　　　　MS. MESSER: Yes. And, you know, your

4 Honor, if you were to talk to some of these folks that

5 run Hofstra about the University of Phoenix, they can

6 give you their opinions on those things. And there are

7 cases in fact, Judge, where there has been a breach of

8 contract found, where for example, a facility was

9 promised and people arrived on campus and that facility

10 wasn't there, okay? So, unfortunately, these things

11 have happened, but that is not what happened here.

12 　　　　　Plaintiffs can't plausibly allege such a

13 thing and, you know, you do have to look at it in the

14 context of what actually happened. And what happened

15 was, we took these courses that everyone would have

16 loved to have been able to continue in the way that

17 they have been going on, and we did the best we could

18 to transition those. These students completed their

19 courses, they got their credits. They were entitled to

20 programming and they received programming. Hofstra

21 fulfilled its obligations to its students. It went

22 above and beyond to do so.

23 　　　　　THE COURT: Counsel, I'm sympathetic -- I'm

24 empathetic, right? By the way, it's no secret and if

25 anybody has an objection, you'll let me know. I am

1  actually an adjunct professor at St. John's, right, so

2  I've done this and I understand all of this.  Actually,

3  let me just put that out there.  If anyone thinks I

4  should recuse myself, you just raise it now.  Is there

5  any issue on that?

6          MS. NOTEWARE:  I'm sorry, this is Ellen

7  Noteware.  I don't know if you mis-spoke.  You said St.

8  John's.  Are you saying Hofstra?

9          THE COURT:  No, no.  If I worked for

10  Hofstra, I'm off, forget it.

11          MS. NOTEWARE:  Okay.

12          THE COURT:  I teach at St. John's.  I'm just

13  saying that as a professor, I understand -- as a part-

14  time professor, I understand the difficulties and I

15  understand the difference between in-person and online

16  instruction.  I'm just saying that.  But if anybody has

17  a problem with that, just say, Judge, you know too much

18  and I'll get off the case.  You tell me.

19          MR. ZAKARIN:  No, your Honor, for Migliore

20  plaintiffs.  No objection.

21          THE COURT:  Stellato, are we good?

22          MR. KUROWSKI:  Your Honor, subject to any

23  additional thoughts from my co-counsel, Mr. Obergfell

24  and Ms. Noteware --

25          THE COURT:  Are your co-counsel here?  They

1   can speak.

2          MR. KUROWSKI:  They are, exactly.  My

3   perspective is, your Honor, since you're not a

4   professor at Hofstra, ethics rules would not require

5   you to recuse yourself.

6          THE COURT:  Excellent, thank you.  I don't

7   think it's a problem but I just wanted to make sure.

8   Okay.  So that said, we all have experience.  We know

9   what happened in the last year, right?  Life changed in

10  many, many ways.  I hear all that.  This is really

11  complicated.

12         Let me go back, but I think I have -- I

13  think I know a solution for now.  Let me go back to

14  counsel for the Migliore plaintiffs and ask you this:

15  If I compare your complaint to the complaint in

16  Stellato, you have not laid out the same level of

17  detail as to what the handbook promised and that sort

18  of thing.  But then again, you're doing it with a

19  different school.  So my question would be, if you had

20  an opportunity to amend yet again, could you allege

21  more details or is what you have it?

22         MR. ZAKARIN:  Your Honor, thank you.  I

23  believe that, given the opportunity to amend -- I'm

24  confident that given the opportunity to amend, we could

25  more sufficiently allege -- I would note, though, that

1  in the complaint as written, your Honor -- I would

2  direct your Honor's attention to the point raised in

3  paragraph 18, which is talking about the concept of

4  non-classroom courses, under which distance education

5  classes fall.  This is not -- this is not merely

6  setting a limit on when you -- at what point you can

7  take a course that's online.

8          THE COURT:  Right.

9          MR. ZAKARIN:  It's saying -- Hofstra is

10  specifically saying, students, you have the right to

11  take between 12 and 17 credit hours per semester.  You

12  have the right to take no online courses your first

13  year.  You have the right to take one online course

14  your second or third year, more than one online course

15  per semester.  Hofstra is therefore obligated, if

16  they're required to provide instruction -- it's a

17  pretty clear implied term that Hofstra is obligated to

18  provide instruction sufficient to satisfy its own

19  policies.

20          THE COURT:  Right.  I hear you, counsel, but

21  let me say, if I read the Stellato complaint, right,

22  there are allegations in there that say -- and I don't

23  have it in front of me but in sum and substance, come

24  to the football games, meet your advisor in person.

25  They have many more details.  My suggestion to you is,

1  I'm going to guess -- I don't know but if you go

2  through the handbook and the -- there probably are

3  similar details but I don't know, maybe there's not.

4          MR. ZAKARIN:  Yes, your Honor, and we

5  mentioned those specifically.  On the website targeted

6  toward law students, Hofstra says, Hofstra Law is

7  situated on a 240-acre Hofstra campus, providing law

8  students access to resources available throughout the

9  community.  The campus is a bustling environment of

10 theatrical performances, concerts, sporting events,

11 lectures --

12         THE COURT:  Wait, wait, wait, what are you

13 reading from right now?  What are you reading from?

14         MR. ZAKARIN:  Paragraph 29 of the first

15 amended complaint, your Honor.

16         THE COURT:  Okay, hold on, hold on, I'm

17 sorry.  I'm doing this electronically and it's really

18 hard to keep everything up on the screen at the same

19 time, so I will go back to that, one second.

20         MR. ZAKARIN:  (Ui), your Honor.

21         THE COURT:  You see, you're not even getting

22 in-person judges.  It's just terrible.  There's all

23 kinds of problems.  This was your amended complaint,

24 which was 15.  Hold on.  Got it.  Okay, tell me what

25 paragraph we're looking at again?

1          MR. ZAKARIN:  29, your Honor.

2          THE COURT:  29.  This is the website,

3    though, right?  Is the website part of the contract?

4          MR. ZAKARIN:  I would argue as counsel for

5    Stellato that it's a question of publications.  I'd

6    argue that is a publication.

7          THE COURT:  I hear you.  I'm a little bit

8    more concerned is, I think someone said, reflective of

9    the agreement in some ways but not the agreement

10   itself.  So it's almost like if the agreement were

11   ambiguous, we'd have to look at it.  You know what I

12   mean?  It's just so hard because the four corners of

13   the agreement -- it's not clear to me where those four

14   corners end, you know?

15         MR. ZAKARIN:  Well, your Honor, I think

16   that's an important point, that having all agreed that

17   these documents supply the terms of the parties'

18   agreement, there's still apparently a question as to

19   what the precise terms of the agreement are.  Plaintiff

20   Migliore alleges that based on the policies he

21   affirmatively agreed to and his rights under the

22   student handbook, Hofstra was obligated to give him the

23   opportunity to satisfy the policies.  These are things

24   that they affirmatively agreed to.  I can tell you for

25   sure that the Hofstra Law student handbook is available

1  online.

2       THE COURT:  Right, but the student handbook

3  -- but this is not the student handbook you're saying.

4  Are you?

5       MR. ZAKARIN:  No, I'm not saying the student

6  handbook but the student handbook also does make

7  reference to various on-campus resources for law

8  students, including the law library --

9       THE COURT:  It's not alleged, though, right?

10       MR. ZAKARIN:  That wasn't specifically

11  identified in the complaint, your Honor, no.

12       THE COURT:  Counsel, please understand, what

13  I'm talking about right now here is just what's in

14  front of me.  I don't want you to walk away thinking,

15  gosh, the judge is criticizing me because my complaint

16  wasn't as good as the other one.  This is hard,

17  creative advocacy you're doing here.  This is very

18  difficult.  It's new to all of us, right?  So no fault,

19  right, is what I'm saying, okay?  And I'm just asking

20  that, if given the opportunity to amend, there would be

21  other things you could add.  Fair?

22       MR. ZAKARIN:  Yes, your Honor, there would

23  be other things we could add.

24       THE COURT:  Okay, that's what I needed to

25  know.  All right, I think I know what I need to do

 1  here.

 2              Anyone else want to add anything else?

 3              MR. KUROWSKI:  Your Honor, this is Daniel

 4  Kurowski for the Stellato plaintiffs again.  I think in

 5  terms of a potential opportunity for handling how to

 6  proceed with the Stellato case, I think it helps to

 7  have a little bit more background in terms of the two

 8  cases.

 9              Our case was the first filed case and we

10  have an appointment under Rule 23(g), appointing my

11  firm as well as Bursor & Fisher and the Berger Montague

12  firm as interim, co-lead counsel for the cases.

13              THE COURT:  Okay.

14              MR. KUROWSKI:  Our case includes a law-

15  student plaintiff and our case is broader than the

16  Migliore case.  The class definition in that case

17  limits it to law students.  Our case includes law

18  students in addition to the undergraduate --

19              THE COURT:  Counsel, I'm laughing only

20  because -- counsel, I'm only laughing because just when

21  I thought it couldn't get more complicated.

22              MR. KUROWSKI:  And my suggestion would be,

23  your Honor, that what we could do because our case is

24  the broader case, staying the case as a later-filed

25  case is another option that we'd suggest would be

1 appropriate here until sort of the issues covering law

2 students, too, are dealt with in our broader Stellato

3 case.  It would be another alternative available.

4 THE COURT:  I hear you.  I think I have a

5 different way of doing it but -- I'm trying to be fair

6 to everybody here but I'm good.  Anything else?

7 MS. NOTEWARE:  Yes, your Honor.  This is

8 Ellen Noteware for the Stellato plaintiffs as well.

9 Going into the background, also, defendants answered

10 our complaint.  We served discovery that they have not

11 answered.  They asked for an extension and then they

12 filed the pre-motion -- started the pre-motion process.

13 THE COURT:  Yes.

14 MS. NOTEWARE:  So we haven't gotten

15 discovery and we don't want to drag this out.  I

16 understand these are very complicated issues but many

17 courts around the country and in New York, Pace, RIT,

18 RPI, Cornell -- many courts have allowed these cases to

19 go forward and are in discovery.  We don't want to keep

20 pushing this down the road with more motion practice

21 and all of that.

22 THE COURT:  I hear you.  Let me say, that's

23 my favorite question of the day.  Do you know why?

24 MS. NOTEWARE:  I do not.

25 THE COURT:  Because I refer all discovery

1  matters to the magistrate judge.

2           MS. NOTEWARE:  Right.

3           THE COURT:  So for discovery, see Judge

4  Lindsay because she's terrific.  She really is.  I used

5  to be a magistrate judge.  I love the way we use

6  magistrate judges.  So I understand your point and

7  that's why I'm trying to resolve this today and not do

8  months of briefing and writing and whatever.  As

9  interesting as these issues are -- counsel, I say this

10 to everyone.  You've raised really interesting issues.

11 Terrific job, really, but I'm going to try to give you

12 a decision today that will give us a plan to go

13 forward, all right?

14          MS. NOTEWARE:  That would be excellent,

15 Judge.

16          THE COURT:  Anything else you want to say?

17          MS. NOTEWARE:  I would just say one last

18 thing.

19          THE COURT:  Go ahead.

20          MS. NOTEWARE:  Also, we wrote to the

21 defendants and suggested that we start talking about

22 settlement, and that was never responded to.  I don't

23 know that there's anything that you could do to

24 encourage that at this point but the plaintiffs are --

25          THE COURT:  They don't have to respond to

1 settlement.  It's a good idea often but this is too

2 complicated right now, I think, until we figure some of

3 this out.  Anyway, I understand why they might not

4 respond.

5          Anything else defendant would like to say

6 before I rule?

7          MS. MESSER:  Sure.  While we appreciate the

8 Court wanting to move the case along and we appreciate

9 the time you've given us today because these are

10 complicated issues, but there are a couple of cases

11 that were cited in our pre-motion letter and I don't

12 know if your Honor has had the opportunity to review

13 them.  But I would strongly request the opportunity to

14 put the full rationale and information before the

15 Court, you know, on a motion to dismiss.

16          THE COURT:  I will say that my chambers has

17 reviewed everything.

18          MS. MESSER:  Okay.

19          THE COURT:  I've not laid my hands on every

20 one of these cases but I will say this:  All the cases

21 you cite me are other district judges, yes?

22          MS. MESSER:  Correct.

23          THE COURT:  Yeah, so that's what I teach my

24 law students.  I say, that's interesting, I just don't

25 have to listen, right?  I can but --

1          MS. MESSER:  Yes.  There are no Eastern

2     District decisions out yet, your Honor, so there are

3     motions pending but they just haven't yet been decided.

4          THE COURT:  I'll be out there but I'm going

5     to do this orally on the record today.  Anyone who

6     wants can order the transcript, although I'm promising

7     you this:  It's not going to be that interesting

8     because as interesting as you've made this, there isn't

9     any Second Circuit guidance yet.  There are a lot of

10    things but I think we have to just figure out pieces to

11    move this forward, okay, so I'm going to rule on that

12    basis.  Now I will proceed to my decision.

13          As set forth in Rule 2(e)(1) of my

14    individual rules, I reserve the discretion to construe

15    the pre-motion letter along with counsels' arguments as

16    the motion itself.  As noted in the rule, this

17    procedure has been upheld by the Second Circuit under

18    appropriate circumstances.  The exercise of such

19    discretion is rendered more appropriate by the

20    existence of the individual rule, which puts counsel on

21    notice of this possibility.  And of course, I brought

22    it up at the beginning of the conference for that

23    reason.  I would also add that given the current

24    pandemic, which is not a bad thing to mention in the

25    context of this case, which turns on the pandemic, I do

1  believe that this helps move things along.

2          I will also say I meant what I said.

3  Counsel did a very good job today because you all took

4  something very (ui) and you made it (ui), so

5  congratulations on your work.  Let me go forward to

6  make a decision.

7          So of course, the motion, which -- I'm going

8  to construe the motions to dismiss as being made.

9  They're decided under a well-established standard for

10  review of such matters as discussed in so many cases,

11  but I'll give you one as an example:  Burrows v. Nassau

12  County District Attorney, 2017 W.L. 9485714 at pages 3

13  to 4, which is a 2017 Eastern District of New York

14  case, which I'm incorporating the standard -- only the

15  standard for deciding a motion to dismiss herein, okay?

16          The Court is required, as everyone knows, to

17  decide, assuming the allegations to be true for the

18  purposes of the motion, whether there are sufficient

19  facts to determine whether the claim is plausible on

20  its face.  So based on a review of the complaints and

21  after considering the arguments of counsel, I find that

22  I have different views of the two complaints, as I

23  think I've already made clear.  So I will do this in

24  slightly reverse order -- well, not really.  I'll just

25  do Stellato first.

1          I'm just going to say that I find that it

2    does state sufficient facts to state a plausible claim

3    as to the breach of contract count or claim.  I do

4    believe it's adequately pled in terms of looking at the

5    handbook promises and so forth, that there is a

6    potential breach of contract claim there, so I do

7    believe it's adequately pled.  As a result, I would

8    deny the motion to dismiss the breach of contract

9    claim.

10          At the same time, having done that, I would

11   grant the motion as to the unjust enrichment and

12   conversion claims as duplicative, and I believe that is

13   hornbook law.  So I'm not going to cite it but I'm

14   fairly confident on that.  I would add that I think

15   defense counsel is also right that on the conversion

16   claim -- and I'll bring this up again in a moment --

17   that the funds of course also are not identifiable,

18   they're fungible and so forth.  I think there are other

19   grounds on which the conversion claim fails.  But I'm

20   going to grant the motion as to unjust enrichment and

21   conversion in Stellato.

22          Migliore presents a very different set of

23   circumstances but I think we'll shortly find ourselves

24   in the same circumstances.  I'm going to explain that

25   fully because my goal, counsel, really is to move this

1 as quickly as possible and save everybody money and

2 time on claims. So on Migliore, I will grant the

3 motion as to the breach of contract claim because I do

4 not find sufficient allegations of specific promises

5 that would be actionable here. That said, I have a

6 suspicion, and counsel has indicated such, that they

7 could re-plead that and include such specific

8 allegations, and I'm going to give them the opportunity

9 to do that. I'll come back in a moment as to what the

10 time frame will be on that.

11 That would leave the unjust enrichment claim

12 and the conversion claim. I will similarly dismiss the

13 conversion claim on the grounds that the funds are

14 fungible and not identifiable, and I believe that will

15 not satisfy the requisites as pled for conversion, so

16 I'm going to dismiss conversion as well.

17 But it does leave unjust enrichment and I

18 have to -- I have to deny the motion as to unjust

19 enrichment. What I expect will happen is if counsel

20 amends and they amend in a manner that's similar to

21 Stellato, I will find myself in the same circumstance

22 and I will say that most likely, we will be (ui) to

23 dismiss the unjust enrichment claim as duplicative. I

24 will also add, as I think I foreshadowed today, that in

25 light of the equitable nature of unjust enrichment and

1   in light of what we all know happened during the

2   pandemic and so forth, I don't have a lot of faith in

3   that claim anyway.  I don't think we have to go very

4   far on that in any event.

5          So I would like to see the Migliore

6   plaintiffs amend.  I will give you one chance to do so.

7   How much time do you need to do that?

8          MR. ZAKARIN:  Your Honor, if I could have

9   ten days, your Honor, ten days to two weeks, your

10  Honor.  I don't want to delay the proceedings and I

11  don't want to delay the actions but --

12         THE COURT:  You know what?  Let's give you

13  two weeks, that's fine.  But in two weeks, you'll file

14  an amended complaint.  And my guess is that if you can

15  bolster up the breach of contract claim, the unjust

16  enrichment claim will become dismissible as

17  duplicative.

18         I want to do that in the fastest way

19  possible and I would urge you to even think about doing

20  that by stipulation or voluntarily or whatever, if you

21  can.  I can't force you to do that but I'd urge you to

22  do that so we don't have to do another round of this

23  discussion.  In other words, if you think the complaint

24  -- maybe counsel can agree that the complaint would

25  fall within the same bucket as Stellato once amended,

1  right, then we can agree to let the unjust enrichment

2  claim go.  But that I will leave up to you all.

3          So that's my ruling.  Are there any other

4  issues or anything else I should address today?

5          MS. MESSER:  Not for the defendant, Judge.

6          THE COURT:  Excellent, thank you.

7          Anything for either plaintiffs?

8          MR. KUROWSKI:  Your Honor, this is Daniel

9  Kurowski.  Not specifically but with respect to --

10 defendants had requested a stay of discovery.  In light

11 of your Honor's order with respect to our case, the

12 stay similarly -- the request for a stay is also

13 denied?

14         THE COURT:  Let me hear defendant on that.

15 What do you say?

16         MS. MESSER:  Well, we did address some of

17 this with Magistrate Judge Lindsay back in the

18 beginning of January.  Just so your Honor is aware, at

19 the time we were required to go through the initial

20 conference and set the discovery schedule, the

21 landscape in these cases -- it was in its infancy.

22         THE COURT:  Yeah.

23         MS. MESSER:  That's the reason that we

24 entered into --

25         THE COURT:  Right.  So what I'm going to do

1  is, I'm going to defer on that issue.  When and in what

2  form discovery -- I don't have an opinion.  I really

3  don't -- should continue at this point and whether once

4  we kind of get the cases settled as to what they would

5  look like, which we should do in the next few weeks,

6  whether discovery should be focused in one way or the

7  other, I'm going to leave that all to Judge Lindsay in

8  the first instance.  Let her decide and then you take

9  whatever other steps you need, all right?

10        MR. KUROWSKI:  Understood, thank you.

11        THE COURT:  All right.  In the meantime,

12  everyone wear your masks, wash your hands, stay safe,

13  get your shots, whatever.  Hopefully, next time we do

14  this, we can do it in person.  But I will emphasize

15  once again, counsel, you did a fine job today.  Thank

16  you for that and we'll talk soon, okay?

17        MS. MESSER:  Thank you, Judge.

18        MR. ZAKARIN:  Thank you, your Honor.

19        MR. KUROWSKI:  Thank you, your Honor.

20        THE COURT:  All right, we are adjourned.

21                * * * * * * *

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          I certify that the foregoing is a correct

19    transcript from the electronic sound recording of the

20    proceedings in the above-entitled matter.

21

22

23

24

25    ELIZABETH BARRON                    April 16, 2021